**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ltfisher@bursor.com
            slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*pro hac vice forthcoming*)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER BRYAN, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>APPLE INC.,<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Christopher Bryan ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Apple Inc. ("Apple" or "Defendant") for the manufacture, marketing, detailing, distribution, and sale of the defective Apple iPad Mini (6th Generation) ("iPad Mini," "iPad Mini 6," or "iPad"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This action is brought on behalf of purchasers of Apple's iPad Mini 6. Apple markets and sells the iPad Mini 6 as a premium tablet, debuting on September 14, 2021, with sales beginning on September 24, 2021, at a weighty price tag of $499 for the 64 gigabyte ("GB") version and $649 for the 256GB version. But the iPad Mini is defective, as the liquid crystal display ("LCD") is prone to "screen tearing which can make images or text on one side of the screen appear to be tilted at a downward angle because of incongruity in refresh rates," causing "one side of the screen [to] look[] as if it's responding faster than the other side, which creates [a] visual disturbance" called "jelly scrolling" that Apple has acknowledged[1] (the "Jelly Scroll Defect" or "Defect"), and which manifests in a manner substantially similar to the following image:[2]



---

[1] Corina Garcia, "Apple Responds to Controversial 'Jelly Scrolling'[]," *Front Page Tech* (Sept. 28, 2021), https://www.frontpagetech.com/2021/09/28/apple-responds-to-controversial-jelly-scrolling-on-ipad-mini-6-says-its-normal/ (last accessed Jan. 5, 2022).

[2] Shujja Imran, "Wobbly Jelly Scrolling on Your iPad mini 6 Screen? Apple Says It's Normal," *MakeUseOf* (Oct. 7, 2021), https://tinyurl.com/4fwt2fw3 (last accessed Jan. 25, 2022).

2.    As the photograph on the preceding page reveals, the visual disturbance goes to the core functionality of the Device as the display is a users' principal means of interacting with the Device.  Due to the Defect, the iPad Mini bends, warps, blurs and obscures text and images rendering the Device unusable.  Worse yet, users have reported motion sickness, nausea, vomiting, and migraines when using the Device due to the Defect.[3]  Although Apple itself publicly acknowledged the problem to niche tech publications just four days after the iPad Mini's release,[4] Apple has continued to sell the iPad Mini and has refused to fix the problem or to amend its marketing materials to reflect the existence of the Defect.  Instead, Apple has insisted, against the weight of evidence, that the Defect is normal.

3.    This is even though thousands of users have reported the problem directly to Apple and on Apple sponsored forums.  This onslaught of negative reviews prompted computer engineers with the tech journal, *iFixit*, to complete a "teardown" of the Device to learn the source of the Defect.[5]  As the photograph below demonstrates, the computer engineers discovered that the iPad Mini has a controller board that is located in a vertical orientation on the left-hand side of the Device.



iPad Mini 2021    iPad Air 2020

[3] "Class Action Lawsuit Against Apple for Jelly Scrolling," *MacRumors* (Oct. 2, 2021), https://tinyurl.com/4e6tzzc6 (last accessed Jan. 5, 2022).

[4] Malcolm Owen, "Apple dismisses iPad mini 'jelly scroll' issue as normal behavior," *Apple Insider* (Sept. 28, 2021), https://tinyurl.com/2p8dnnvb (last accessed Jan. 5, 2022).

[5] Juli Clover, "iFixit Explains iPad Mini 'Jelly Scroll' Issue in Teardown Video," *MacRumors* (Sept. 29, 2021), https://tinyurl.com/2xvm7ytc (last accessed Jan. 25, 2022).

4.     By contrast, the iPad Air, which does not exhibit the same issue, has a controller board located at the top of the tablet.  According to the engineer responsible for the teardown:

> When you scroll parallel to the direction the display is refreshing, the display still isn't refreshing all at once, but the effect of the refresh is less noticeable because it's not splitting the text.
>
> This is why you probably don't notice this on other displays.  The jelly scroll is usually masked because the display is refreshing (or scanning) parallel to whichever way the scrolling motion is taking place.  So a computer monitor will refresh vertically in its landscape orientation, and a smartphone will refresh vertically in its portrait orientation.
>
> **It just so happens that this iPad [M]ini display is refreshing horizontally when you hold it in its vertical orientation, which is the way you typically hold an iPad to scroll**.[6]

5.     Despite the mountain of pre-discovery evidence of the Defect and Apple's knowledge of the issue stemming from (1) its own quality control and internal testing; (2) in-store display models that exhibit the Defect free of user interference; (3) repairs data and internal reporting mechanisms; (4) complaints made directly to Apple in person, over the phone, and via online submissions, (5) complaints posted online across the internet, including on the websites of major retailers, and on its own forums; (6) online reputation management; (7) articles written by tech journals; (8) the *iFixit* tear down demonstrating the Defect; and (9) Apple's statements acknowledging the Defect, Apple has refused to issue a recall or otherwise fix the issue.  Instead, as one journalist has written, "iPad mini 6 users appear to have been relegated to a weird state of helplessness at this moment where neither hardware nor software support for the issue appears to be in the pipeline."[7]

6.     Accordingly, Plaintiff brings his claims against Apple individually and on behalf of a class of all others similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (2) violation of the Consumers Legal Remedies Act, Cal. Civ.

---

[6] *Id.* (emphasis added).

[7] Nadeem Sarwar, "Don't Expect Apple to Fix iPad Mini 6's Jelly Scrolling Issue," *Screen Rant* (Sept. 29, 2021), https://screenrant.com/ipad-mini-6-jelly-scroll-not-issue-problem-apple/ (last accessed Jan. 5, 2022).

Code § 1750, *et seq*.; (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.; (4) violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq*.; (5) Fraud; (6) Fraudulent Omission or Concealment; (7) Fraudulent Misrepresentation; (8) Negligent Misrepresentation; (9) Quasi-Contract / Unjust Enrichment.

## PARTIES

7.      Plaintiff Christopher Bryan is, and at all times relevant to this action has been, a citizen of Colorado, residing in Highland Ranch, Colorado.  In or around September 2021, Plaintiff Bryan purchased his iPad Mini 6 directly from Apple's online store, Apple.com.  Plaintiff's device was shipped by Apple to the Apple store located in Park Meadows, Colorado.  This is the location where Plaintiff received his Device.  Numerous of the materials Plaintiff reviewed and relied on prior to his purchase are identified below and include the labeling, packaging, and marketing materials of the iPad Mini 6, including statements by Apple on Apple's website as also identified below such as Apple's representations concerning the iPad as a tablet; that the tablet could be used for "graphically rich games to pro apps," the iPad's use "from creativity to productivity," including the use of "productivity" apps like the Microsoft Office application, DocuSign, PDF Expert, Box, and Numbers; the use of the tablet for "working, reading, exercising, playing games;"  the iPad's "complete redesign," with features such as an "all-screen design," and the iPad's "edge-to-edge screen," enabling the Device to "mak[e] text sharp," amongst the others identified below.

8.      In reviewing these materials, Plaintiff understood Apple's claims to be representations and warranties by Apple that the Device's display would come substantially free of defects and that he could use the Device during his normal course of use.  Plaintiff Bryan reasonably relied on these representations and warranties in deciding to purchase the Device, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Device, or would not have purchased it on the same terms, if the true facts had been known.  But Plaintiff Bryan's Device did not operate as marketed.  Instead, Plaintiff Bryan's Device suffered from the Jelly Scroll Defect, rendering the display inoperable for its principal and intended uses, including due to warped, bent or obscured text and images.  As a direct result of Apple's material misrepresentations and omissions, Plaintiff Bryan suffered, and continues to

suffer, economic injuries.  Despite these injuries, Plaintiff Bryan remains very much interested in purchasing from Apple as he believes that Apple is a reputable company, appreciates Apple's commitment to sustainability,[8] and values Apple's storied commitment to innovation.[9]  Plaintiff Bryan looks forward to purchasing from Apple in the future and hopes that he can be assured that Apple's representations about its products are accurate.

9.    Defendant Apple, Inc. is incorporated under the laws of the State of California and maintains its principal place of business in Cupertino, California.  In August 2020, Apple became the first publicly traded U.S. company to surpass a market capitalization of $2 trillion[10] and has gone on to become the world's first $3 trillion company in January 2022.[11]  Apple is responsible for the manufacture, marketing, detailing, distribution, and sale of the defective Apple iPad Mini (6th Generation).

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiff, as well as most members of the proposed class, are citizens of states different from Defendant.  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11.    This Court has personal jurisdiction over Apple because its principal place of business is within this District and it has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper and necessary.

---

[8] Lisa Jackson, Apple's Vice President of Environment, Policy and Social Initiatives, *Apple*, https://www.apple.com/environment/ ("We don't pretend to have all the answers.  What we do have are goals to strive for, and a global community of businesses committed to doing the right thing by people and the planet.") (last accessed Jan. 24, 2022).

[9] Steven Levy, "Apple Inc.,' *Britannica*, https://www.britannica.com/topic/Apple-Inc (outlining Apple's historic innovations).

[10] Sergei Klebnikov, "Apple Becomes First U.S. Company Worth More Than $2 Trillion," *Forbes* (Aug. 19, 2020), https://www.forbes.com/sites/sergeiklebnikov/2020/08/19/apple-becomes-first-us-company-worth-more-than-2-trillion/?sh=56d534a66e6e (last accessed Jan. 5, 2022).

[11] Paul R. La Monica, "Apple has become the world's first $3 trillion company," *CNN Business* (Jan. 3, 2022), https://www.cnn.com/2022/01/03/investing/apple-three-trillion-dollar-market-cap/index.html (last accessed Jan. 5, 2022).

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omission giving rise to Plaintiff's claims occurred in this District.

13.     The practices described herein were conceived, reviewed, approved, and otherwise controlled from Apple's nerve center, its headquarters in Cupertino, California.  Employees at Apple's headquarters directed the production and assembly of the iPad Mini's hardware and software, including the defective LCD displays.   Promotional activities and literature were developed and coordinated at, and emanated from, Apple's California headquarters.  For these reasons, and those listed next, the application of California law is appropriate for non-California residents.  For example, the launch event for the iPad Mini occurred in Cupertino.  Apple made critical decisions about the development, marketing, and advertising of the iPad Mini in California. Misrepresentations and omissions alleged herein were made by Apple employees based in California and were contained, among other places, on Apple's website, which is maintained by Apple employees based in California.

## FACTUAL ALLEGATIONS

### A.      An Overview Of A Tablet's Key Features

14.     The *Merriam-Webster* dictionary defines "tablet" as "a mobile computing device that has a flat, rectangular form like that of a magazine or pad of paper, that is usually controlled by means of a touch screen, and that it typically used for accessing the Internet, watching videos, playing games, reading electronic books, etc."[12]

15.     Experts at *LifeWire* support this definition by noting that "[s]ince tablets are built for mobility, and the entire screen is touch-sensitive, you don't necessarily need to use a keyboard and mouse with one.  Instead, you interact with everything on the screen using your finger or a stylus."[13]

---

[12] "Tablet," *Merriam-Webster*, https://www.merriam-webster.com/dictionary/tablet (last accessed Jan. 5, 2022).

[13] Tim Fisher, "What Is a Tablet?" *LifeWire* (Dec. 6, 2021), https://www.lifewire.com/what-is-a-tablet-4157433 (last accessed Jan. 5, 2022).

16.    Experts at Lenovo agree, noting that "a tablet is a highly portable PC whose primary interface is a touch screen that occupies the full length / width of device[.]"[14]

17.    Because of the screen's centrality to the overall functioning of a tablet, "the screen size and screen quality" are the "most crucial aspect to consider while buying a tablet."[15] Specifically, the screen "is the most-used component of the device."[16]

18.    According to John Biggs, editor-in-chief of *Gizmodo*, one of the primary reasons consumers purchase tablets is because they "make great e-readers."[17]    This is consistent with Apple's long-standing marketing campaign to convince consumers that iPads should be their go-to device for e-reading.  In fact, Apple's "very first campaigns showed iPads in a context that helped the device instantly make sense – in the lap, being read."[18]  Apple has not let up on this feature in marketing the iPad Mini, noting that the Device can be used when "working, reading, exercising, playing games, or sleeping."[19]    Apple even boasted the iPad Mini as a "digital journal and sketchbook [that] users can take anywhere."[20]  And, as set forth below, these statements are set out alongside images showing the iPad Mini performing these functions.

19.    Accordingly, consumers seeking to purchase a tablet over another device such as a desktop computer are, at a minimum, interested in purchasing (1) an integrated unit that functions primarily through the use of a touch screen; (2) that is portable, allowing the user to easily move

---

[14] Lenovo, "What is a tablet PC?" Laptop FAQs, https://tinyurl.com/4ym7d2v7 (last accessed Jan. 25, 2022).

[15] Asif Iqbal Shaik, "Tabelt Buying Guide 2021: These are the Features You Should Look Out For," *OnSiteGo* (Aug. 29, 2021), https://onsitego.com/blog/tablet-buying-guide-2020/ (last accessed Jan. 5, 2022).

[16] *Id.*

[17] John Biggs, "10 Reasons to Buy A Tablet (And 5 Reasons Not To)," *TechCrunch* (Feb. 12, 2011), https://techcrunch.com/2011/02/12/10-reasons-to-buy-a-tablet-and-5-reasons-not-to/ (last accessed Jan. 5, 2022).

[18] Sorcha Daly and Wilson Fletcher, "The truth about tablets: Our report into how consumers are really using their devices today," *Medium* (Aug. 4, 2015), https://medium.com/thehumanlayer/the-truth-about-tablets-our-report-into-how-consumers-are-really-using-their-devices-today-500ce0862cde (last accessed Jan. 5, 2022).

[19] Apple Inc., "Apple unveils new iPad mini with breakthrough performance in stunning new design," (Sept. 14, 2021), https://tinyurl.com/2xefsj6f (last accessed Jan. 25, 2022).

[20] *Id.*

around and travel with their unit; and (3) that is convenient for reading, surfing the Internet, and playing games.  In doing so, consumers reasonably expect their tablets to exist independently of external monitors for their use and to enable reading, watching, and playing all the while free of characteristics that minimize their viewing pleasure, such as the Jelly Scroll Defect.

**B.    Apple Releases iPad Mini, Emphasizing The Interrelationship Between iPad Mini's Superior Technology And Screen Display Capabilities**

20.    According to Greg Joswiak, Senior Vice President of Apple's Worldwide Marketing, in designing the iPad Mini, Apple stayed true to co-found Steve Jobs' commitment that Apple build "the whole widget."[21]  And, in fact, Mr. Joswiak noted that "[w]e've been making the whole widget for all of our products, from the iPhone, to the iPad, to the watch."[22]  That is, Apple made and controlled the entire development of the iPad Mini from start to finish.

21.    Apple debuted the iPad Mini 6 on September 14, 2021 to great fanfare.  During the event, Apple CEO Tim Cook remarked that "there's simply no other device like iPad Mini.  It gives users the power of iPad in its most portable form, which makes it indispensable for a wide range of uses, like when it's secured to the leg of a pilot in flight, or pulled from a doctor's lab coat to care for patients in the ER."  Mr. Cook's statements were made alongside the accompanying images:

///

///

///

///

///

///

///

///

///

---

[21] Om Malik, *The Omshow Podcast* (Nov. 17, 2020), https://om.co/2020/11/17/why-m1-chip-by-apple-matters/ (last accessed Oct. 27, 2021).

[22] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





22.    Apple reinforced these claims in its September 14, 2021 Press Release for the iPad Mini, noting that the iPad is capable of "handl[ing] even the most demanding tasks – from

graphically rich games to pro apps by designers, pilots, doctors, and more.  With its powerful performance and compact design, iPad mini is the ultimate tool users can take anywhere."

23.     More than puffery, these are concrete claims about the iPad Mini's capabilities.  But the iPad Mini cannot handle graphically rich video game or pro apps due to the Jelly Scroll Defect. Worse yet, the Jelly Scroll Defect has caused users to experience motion sickness, nausea, vomiting, and migraines when using the Device.

24.     Apple's statements in this regard created a context in the minds of reasonable consumers about the iPad Mini and served to assure such consumers that if the iPad Mini can serve these functions that are critical to society, that the iPad Mini can also be used for less critical functions such as unimpeded e-reading, movie watching, and game playing.  In fact, as demonstrated below, Apple acknowledges in its marketing material that the iPad can perform these latter functions.  However, as discussed throughout, this has not been the case for consumers.

25.     Nonetheless, Apple sought to reinforce notions of the functionality and superiority of the iPad Mini's display during the launch with its emphasis on the iPad Mini's "complete redesign."  That is, Apple refers to the iPad Mini's "all-new enclosure" which features an "all-screen design" with "narrow borders and . . . rounded corners."  Because of this new design, Apple prioritized the "thin[ness]" of the Device as well as integration of the new, expanded Liquid Retina Display (also referred to as the "LCD" display).  Apple's Product Manager for the iPad, Katie McDonald, remarked that "[w]ith this new design we were able to increase the screen size all the way out to 8.3 inches, while keeping the same compact footprint."

26.     But extending the screen in this way required Apple to shift around certain of the iPad's internal and external components.  For example, Ms. McDonald stated that "[a]nd delivering this edge-to-edge screen meant finding a new location for Touch ID" which was moved "right to the top button of the iPad Mini."  Ms. McDonald's statements were then accompanied by the following photographs emphasizing Apple's redesign of the iPad Mini's hardware:

///

///

///

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26    27.    According to experts, the iPad Mini's redesign, and in particular, this shifting of

27  internal and external components is at the root of the Defect.  As one expert has remarked, "[t]he

28  location of the distortions surprisingly coincide with how the protruding elements of the boards are

located inside the case.  This fact makes us speculate there is a probably a manufacturing defect."[23] And following *iFixit*'s "tear down" of the iPad Mini as outlined above, several technicians and experts have expressed agreement as to the nature of the Defect.  Samuel Axon of *ArsTechnica*, for example, remarked that, "[w]hen tearing the mini down, *iFixit* found that the controller board that drives the tablet's display is oriented vertically.  By contrast, the iPad Air's is oriented horizontally. *iFixit* suggest that the jelly scrolling effect occurs when the tablet's orientation doesn't match the placement of the controller board, because the line-by-line refresh also happens relative to that board's orientation."  Mr. Axon then stated that "[s]ure enough, slow-motion footage of the iPad mini shows the jelly scrolling in portrait mode (a vertical orientation) but not in landscape (a horizontal one)."[24]  JC Torres of *SlashGear* also wrote on the issue, stating that "[u]nfortunately, it does mean that it's not something that can be easily repaired, and the only recourse users will have is to either get used to it or hope that Apple develops some [fix]."[25]

28.     Despite this evidence, Apple has continued to maintain that the Jelly Scroll is normal behavior for an LCD display.  However, that notion has been swiftly rebutted by tech experts.  As Iskren Gaidarov of *PhoneArena* pointed out, Apple's statement "[doesn't] explain why it is more pronounced on the new iPad mini 6" as compared to other devices.[26]  And, significantly, *ArsTechnica* expert, Andrew Cunningham, also rebutted Apple's stance, noting that "[w]e maintain that this effect is noticeable on the iPad mini in a way that is not noticeable on other 60 Hz LCD iPads we've tested, like the iPad Air 4 and the latest $329 iPad."[27]

29.     Nonetheless, Apple has continued to market the Device without disclosing the nature of the Defect, including in its commercials, advertisements, and packaging.  Instead, Apple

---

[23] "Apple Could Recall The iPad Mini 6 Due to Several Screen Problems," *GizChina* (Oct. 6, 2021), https://tinyurl.com/3cvtn9ys last accessed Jan. 25, 2022).

[24] Samuel Axon, "iPad mini teardown sheds new light on 'jelly scrolling' controversy," *ArsTechnica* (Sept. 30, 2021), https://tinyurl.com/2s3mywsr (last accessed Jan. 26, 2022).

[25] JC Torres, "iPad mini 6 iFixit teardown explains jelly scrolling behavior," *SlashGear* (Sept. 29, 2021), https://tinyurl.com/9bactrb4 (last accessed Jan. 26, 2022).

[26] Iskren Gaidarov, "Teardown video shows the jelly scrolling effect on the iPad mini 6 vs other iPads," *PhoneArena* (Oct. 1, 2021), https://tinyurl.com/2p946txp (last accessed Jan. 26, 2022).

[27] Andrew Cunningham, "Newest iPad mini has a subtle scrolling problem," *ArsTechnica* (Sept. 27, 2021), https://tinyurl.com/y5m5mbyp (last accessed Jan. 26, 2022).

has concealed the Defect, opting instead to market the Devices as capable of enabling the consumer to read, play games, and write despite the fact that each of these functions and features are hampered by the Defect.  One commercial, for example, set outs the iPad's capabilities side-by-side with images of the iPad Mini performing various tasks.  In one such shot, a young man moves up an escalator while seemingly organizing his calendar.  Apple makes partial representations as to the iPad screen, but makes no mention of the Defect.



30.     In another shot, a young woman moves down an escalator while playing a game of basketball on her iPad.  Similarly, Apple makes partial representations as to the iPad display, but makes no mention of the Defect in this shot.



31.   In another shot, a young woman stands in an elevator while swiping and reading on her iPad.  Again, Apple makes partial representations as to the iPad's screen, but makes no mention of the Defect.



32.   In another shot, a child stands in what appears to be a museum while writing on her iPad.  Apple makes partial representations as to the iPad screen, but makes no mention of the Defect.



33.     On the iPad's product page as found on Apple's website, the iPad is featured. However, as the following snapshots demonstrate, Apple fails to disclose the Defect.





///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26  ///
27  ///
28  ///

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   34.   Instead, Apple affirmatively reiterates that the iPad Mini's "New all-screen design,"

16   "all new enclosure," "new, larger edge-to-edge screen," enables the Devices to "make[] text sharp."

17   This latter marketing point is important to Plaintiff's claims as reasonable consumers would not

18   expect a device marketed as "making text sharp" to obscure, bend or warp text, making it more

19   difficult to read due to the Jelly Scroll Defect.   This notion is support, for example, by dictionaries

20   such as the *Cambridge Dictionary* which defines "sharp" in this context as "clear; easy to see or

21   understand" and illustrates the term in the following way: "This TV gives a very sharp picture."[28]

22   Similarly, *Collins Dictionary* defines "sharp" in this context as "clearly defined; distinct; clear" and

23   illustrates the term as follows: "a sharp contrast."[29]   Likewise, *Macmillan Dictionary* defines

24
25
26

[28] *Cambridge Dictionary*, "sharp," https://dictionary.cambridge.org/dictionary/english/sharp (last accessed Jan. 26, 2022).

27
[29] *Collins Dictionary*, "Definition of 'sharp,'"
https://www.collinsdictionary.com/us/dictionary/english/sharp (last accessed Jan. 26, 2022).

28

"sharp" in this context as "clear and seen in a lot of detail" and provides the following illustration: "The new high-definition TV offers razor-sharp pictures[.]"[30]

35.     Nonetheless, Apple doubles down on these representations, telling consumers to "Do Anything Better, With iPad."  By this, Apple explains "[f]rom creativity to productivity, you can do everything you love more easily and more efficiently."  Apple then proceeds to recommend apps on the basis of consumers' interests in productivity.   Apple, for example, encourages consumers to download the Microsoft Office application, DocuSign, PDF Expert, Box, and Numbers.  However, Apple would have known that the Defect would detract from consumers' ability to be productive, especially as apps like Microsoft Office and PDF depend on reading and, as discussed, that function, amongst others, is frustrated as a result of the Defect.  This frustration also would have further detracted from consumers' efficiency, thereby undermining Apple's claims.



---

[30] *Macmillan Dictionary*, "sharp," https://www.macmillandictionary.com/us/dictionary/american/sharp_1 (last accessed Jan. 26, 2022).

36.     Apple's use of the terms, "efficient[]" is important in this context and would lead reasonable consumers to believe that they could use their iPad Mini's for such tasks as working and reading, amongst others.   The *Cambridge Dictionary*, for example, defines "efficient[]" as "working or operating quickly and effectively"[31]   The *Collins Dictionary* similarly defines "efficient[]" as "able to do tasks successfully, without wasting time or energy."[32]   Accordingly, consumers would not expect their Devices to manifest a Defect that would impinge on their ability to complete their chosen tasks such as studying for class and preparing for work.

## C.     Consumers' Experience With The iPad Mini 6's Display

37.     The internet is replete with complaints from consumers who have expressed dissatisfaction about the Defect on Apple's own website, third-party websites such as that of major retailers, like Walmart, Amazon, and Best Buy, blogs such as MacRumors, and on social media, including Twitter, where users have created hashtags (i.e. #) including "#jellyscroll," "#jellyscrolling," and "#jellygate."

38.     These complaints began almost immediately following Apple's first sales of the Devices and have continued throughout the sales period.   The following examples are not meant to capture the entire universe of complaints.   Instead, they are a sampling of the complaints online that any reputable company, like Apple, would have discovered.   This is especially true considering that numerous of the social media posts explicitly "tag" Apple and so, Apple would have received notice of such comments.

39.     On September 26, 2021, one user took to Amazon's page to write: "Great device with a terrible screen issue . . . The left portion (in portrait) of the screen refreshes at a slower rate than the right, causing content to distort when animating, or most notably, when scrolling.   This is currently present on all units (I confirmed by going to Apple store and all 5 units I inspected had this issue as well) . . . this screen distortion gives me a headache[.]"

---

[31] *Cambridge Dictionary*, "efficient," https://dictionary.cambridge.org/dictionary/english/efficient (last accessed Feb. 1, 2022).
[32] *Collins Dictionary*, "Definition of 'efficient,'" https://www.collinsdictionary.com/us/dictionary/english/efficient (last accessed Feb. 1, 2022).

1  40.     On September 26, 2021, another user took to Apple's forum to write: "I have the

2  same issue with my iPad mini 6.  After a while I also feel motion nauseous . . . I can't use it like

3  this : ( "

4  41.     On September 27, 2021 one user took to Apple's forum to write "Has anyone [else]

5  had issues with jelly scroll while scrolling[?]"

6  42.     On September 27, 2021, one user took to Twitter and tweeted: "#jellygate on the

7  new iPad mini . . . what's with this screen?"  The user also included a video, an image of which is

8  as follows:



24  43.     On September 28, 2021, one user took to *MacRumors*—a blog dedicated to

25  "purchasing decisions and technical aspects of the iPhone, iPod, iPad, and Mac platforms"—to

26  write: "[Steve] Job[s] would never allow such 'Jelly' product out . . . which is against Apple's

27  fundamental philosophy and defected by industry standard.  By saying 'LCD normal,' . . . it is just

28  irresponsible."

44.     On September 28, 2021, another user took to MacRumors to write: "I really do wish they were more concerned about this actually."

45.     On September 29, 2021, one user took to Walmart's page to write: "the ONLY Problem is the 'JELLY SCREEN DEFECT.'  It is very noticeable and you can see lines of Text slant and wobble . . . For a $500 device that is unacceptable . . . Hopefully Apple will acknowledge and fix the issue[.]"

46.     On September 29, 2021, one user took to Twitter and tweeted: "Jelly scrolling is definitely an issue!  Apple denying it is a[n] additive sign that they have lost touch with the customer after all the support and success that they're received.  Shame on you @Apple!!! #iPadmini #jellyscroll."

47.     On September 30, 2021, another user took to Apple's forum to respond to the September 27, 2021 question posited above: "Yes, I have had the jelly scroll on mine.  I also tried out two at my local stores and they also had the same problem.  It's especially visible when I read text, it tilts every time I scroll down and is quite distracting."

48.     On September 30, 2021, another user took to Amazon's page to write: "Research the word 'jelly scroll' before buying the 2021 iPad mini 6.  Apple says 'jelly scrolling' is normal for this product but give me a break . . . None of the other iPads have this problem."

49.     On September 30, 2021, another user took to Amazon's page to write: "Agree with the other reviews regarding the display issue.  It's bad."

50.     On October 2, 2021, another user took to Amazon's page to write: "Apple says the 'jelly scrolling' is normal for this product but give me a break . . . None of the other iPads have this problem."

51.     On October 3, 2021, another user took to MacRumors to write: "I think the display is borked so people would be upsold the 120hz promotion display."

52.     On October 3, 2021, another user took to Amazon's page to write: "iPad mini 6 has a screen defect."

53.     On October 3, 2021, another user took to Amazon's page to write: "Screen is terrible and gives headache."

54.     On October 6, 2021, another user took to Amazon's page to write: "It is my third iPad mini and I am so disappointed in the jelly scroll screen.  As much as I want it, I will not accept this flaw or Apple's explanation of it.  Whether they can't or won't fix it I am not sure . . . Shame on Apple . . . for not admitting the problem and trying to pass it off as normal behavior of the screen."

55.     On October 6, 2021, another user took to Amazon's page to write: "Don't spend your hard-earned money on this.  The jelly scroll display is unacceptable for this price point.  My $190 Samsung LCD screen tablet doesn't jelly scroll whatsoever.  Apple is full of it to say this is 'normal' for LCD screen.  It's proof engineering and a real shame coming from a company like Apple[.]"

56.     On October 8, 2021, another user took to Apple's forum to write: "I just called apple care because my ipad mini has a jelly scroll. And they said that it is a feature.  If it is a feature how to turn it off?  It is really annoying making my head confuse[d] every time I see this feature.  Or is there any solution from Apple for this idiot jelly scrolling?"

57.     On October 11, 2021, another user took to Amazon's page to write: "The jelly scrolling is a noticeable issue[.]"

58.     On October 11, 2021, another user took to Apple's forum to respond to the September 27, 2021 question posited above: "I went to my local Apple store, all set to trade in my Mini 5 for the new Mini 6.  Lucky for me, they were sold out.  Once I saw all the info about Jelly Scroll, I went to see the Mini 6 at my local Best Buy.  The Jelly Scroll is very evident when scrolling a page of text.  It would drive me nuts to see it every time I was looking through text.  For Apple to say this is 'normal,' I am sorry.  They should not be charging $500 for a screen that does not display text properly . . . The problem to me, is huge."

59.     On October 13, 2021, another user took to MacRumors to write: "This is sad.  I am really having a hard time getting used to the jelly scrolling . . . Even when moving very slowly it makes it a lot more taxing to read."

///

///

60.     On October 14, 2021, another user took to MacRumors to write: "It's so so bad.  It actually makes me nauseous.  The fact that it doesn't happen in . . . other iPads tells me it's a defect either with software or hardware."

61.     On October 15, 2021, another user took to MacRumors to write: "Wow I don't know about jelly scrolling and its effect in longer use, but I just had a few minutes with a demo piece in the store . . . The experience was so horrible just generally so jittery and choppy . . . for me personally it was a horrible experience[.]"

62.     On October 21, 2021, another user took to MacRumors to write: "I wouldn't both.  It's awful."

63.     In November 2021, a user took to Best Buy's website to write: "Screen has distortion problems.  Would not recommend."

64.     On December 8, 2021, another user took to Amazon's page to write: "The screen was not at the required level."

65.     On December 22, 2021, another user took to MacRumors to write: "Just skip this [iPad] mini generation."

66.     On December 28, 2021, another user took to Amazon's page to write: "The issue is known as 'jelly scrolling' is so bad that nothing else about the Mini matters.  It's Antennagate all over again, pretending a major design flaw is normal."

67.     On January 4, 2021, another user took to MacRumors to write:  "The funny thing is Mini 6 is so expensive [but] the screen quality is the worst in iPad history."

68.     On January 4, 2021, another user took to MacRumors to write: "It is not hard to notice, especially in Books / Safari or an app like concepts scrolling a drawing with thin lines."

69.     On January 4, 2021, another user took to MacRumors to write:  "The funny thing is Mini 6 is so expensive [but] the screen quality is the worst in iPad history."

70.     The fact that so many consumers made similar complaints about the Defect indicates that the complaints were not the result of individual circumstances or user error, but instead a systematic problem with the iPad Mini's screen.  However, instead of addressing this issue as a Defect, Apple has ignored its consumers' complaints.

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D.      Other Sources of Apple's Knowledge Of The Defect

71.      In addition to examples of the user reports set out above, Apple would have long known about the Defect from multiple other sources, including through its extensive quality control and pre-release testing stemming from Apple's desire to "make the whole widget," in store display models that exhibited the Defect free of user interference, repairs data and internal reporting mechanisms, online reputation management, articles written by tech journalists, *iFixit*'s tear down of the Device, as well as its own statements on the Defect shortly after the Device's release. Nonetheless, Apple concealed and affirmatively misrepresented this knowledge in advertising, packaging, and marketing of the Device, and has continued to sell the iPad Mini 6 despite the Defect.

72.      First, Apple would have known about the Defect through its own quality control and extensive pre-release durability testing which it does for all of its products, including the iPad Mini.  Apple has previously acknowledged that "every new product requires its own test."  To this end, Apple has numerous labs and testing facilities designed for these sorts of pre-release testing, including, for example, Apple's Secret Wireless Testing Lab and its Input Design Lab.  In the past, Apple has widely publicized its rigorous pre-release tests.  For instance, Apple claims in testing its iPhone, a comparable product, the device must go through five testing, including a "three-point bend test," a "pressure-point cycling test," a "torsion test," a "sit test," and real-life user studies.  In fact, in the iPad Mini's *Product Environmental Report*, Apple recognized that "[w]e also run our own Reliability and Environmental Testing Labs, where our products go through testing before they leave our doors."  Apple also remarked that "iPad mini . . . has undergone rigorous testing for durability" and that "[w]e apply rigorous controls for materials users touch."  In doing so, Apple would have discovered the Defect.

73.      Second, Apple would have discovered the Defect based on the fact that in-store display models also exhibit the Defect.  Evidence of this is demonstrated by consumer observations, a few of whom are quoted above and not only pertain to models in Apple's stores, but also those at other retailers like Best Buy.  The likelihood of this is furthered by Apple's unique in-store layout which allows consumers "to see, handle and use the company's products before

handing over money."[33] In furtherance of this aim, "Apple hosts 'Today at Apple' sessions at its stores to teach customers how to better use their Apple products."[34]   During these sessions, sales representatives would have encountered and discussed the Defect internally. Combined with Apple's unique approach to sales, which according to one salesperson who explained it to *Forbes*, "staff make more money by being promoted, and they get promoted by the results on customer-satisfaction forms . . . [which] means the salespeople value helping the customer out over pushing a sale."[35]   In helping the customer, Apple's salespeople would also have discovered the Defect. Moreover, provided that in-store display models exhibit the Defect, the Defect manifests independently of user error.

74.     Third, thousands of users have reported this issue to Apple and have sought out repairs from Apple for the iPad Mini Defect.  Apple technicians have responded with the ready-made quip that the Defect "is a feature" rather than a defect.  This suggests that Apple technicians have been put on notice of the Defect.  Moreover, Apple technicians have explicitly stated to consumers who have sought out repairs that they "'wouldn't be surprised' if Apple announces a recall for the iPad Mini 6 display."[36]   This is significant as modern companies, including Apple, have "internal product recall team[s]" tasked with "implementing quality control procedures designed to reduce the risk of—and perhaps even prevent—major recall expenditures."[37]   Apple's team tasked with this function would have learned of the Defect through this reporting mechanism.

75.     Fourth, online reputation management (commonly called "ORM" for short) is now a standard business practice among most major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on

---

[33] Elly Strang, "Why Apple dominates the retail world – as told by its most knowledgeable fan (not me)," *The Register* (Oct. 22, 2015), https://theregister.co.nz/2015/10/22/why-apple-dominates-retail-world-told-its-most-knowledgeable-fan-not-me/ (last accessed Jan. 27, 2022).

[34] MacRumors Staff, "Apple Store," *MacRumors* (Jan. 12, 2022), https://www.macrumors.com/guide/apple-store/ (last accessed Jan. 30, 2022).
[35] *Id.*
[36] Felipe Esposito, "iPad mini 6 users complaint about LCD discoloration and distortion issues," 9to5Mac (Oct. 5, 2021), https://9to5mac.com/2021/10/05/ipad-mini-6-users-complain-about-lcd-discoloration-and-distortion-issues/#disqus_thread (last accessed Jan. 27, 2022):
[37] American Society for Quality, "What Is a Product Recall?" https://asq.org/quality-resources/recalls (last accessed Jan. 27, 2022).

consumer services.  "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before the damage to the individual's or brand's reputation."[38]

76.     Like most companies, Apple presumably cares about its reputation and regularly monitors online consumer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marketing analytics.  Review like those copied above would have been particularly attention-grabbing for Apple's management because extreme reviews are sometimes the result of extreme problems and – just like any other modern company – Apple is presumably sensitive to the reputational impact of negative online reviews.  And, these negative online reviews were posted around the web, including on the sights of several major retailers, including Amazon, Wal-Mart, and Best Buy.  Hence, Apple's management knew or should have known about the above-referenced consumer complaints shortly after each complaint was posted online.  This is especially true given that the comments started appearing online shortly after the iPad Mini was released and have continued through the date of the filing of this Complaint.

77.     Fifth, these complaints were also memorialized by tech publications that have written publicly and extensively on this Defect within just two days of the iPad's release.  On September 26, 2021, Anam Hamid of *Phone Arena*, for example, reported that "[t]he new iPad mini 6 suffers from an annoying jelly scrolling issue" and that the iPad "went on sale on September 24 and early adopters have already started experiencing the issues."  On September 29, 2021, Phillip Tracey of *Laptop Mag* reported that "iPad mini 6 display problem is angering customers" and that "[d]isgruntled iPad mini users are calling the issue 'jelly scroll'" and that "[s]everal media outlets replicated the problem and folks speaking to 9to5Mac say it occurs on Apple Store demo units, suggesting the problem isn't limited to a bad batch of sales."[39]

---

[38] Online Reputation, https://websolutions-maine.com/online-reputation/.
[39] Phillip Tracey, "iPad mini 6 display problem is angering customers [Update: Apple says it's normal]," *Laptop Mag* (Sept. 29, 2021), https://www.laptopmag.com/news/ipad-mini-6-display-problem-is-angering-customers-what-you-need-to-know (last accessed Jan. 27, 2022).

78.     Sixth, in light of the onslaught of these negative customer reviews, *iFixit* completed a "tear down" of the iPad Mini. *iFixit* engineers discovered that the Device has a controller board that is located in a vertical orientation on the left-hand side of the device and that rather than "refreshing (or scanning parallel to whichever way the scrolling motion is taking place . . . [the Device] display is refreshing horizontally when you hold it in its vertical orientation, which is the way you typically hold an iPad to scroll."[40]   This is not how other devices work.   As *iFixIt* engineers remarked: "[t]his is why you probably don't notice this on other displays."   Following this review, numerous publications referenced and concurred with iFixit's results.   Accordingly, Apple would have learned of iFixit's tear down, and would have had knowledge of the Defect.

79.     Seventh, Apple, in the wake of this negative publicity, responded from an inquiry from Andrew Cunningham of *ArsTechnica*, noting just five days after the iPad's release that "the 'jelly scroll' issue on the 6th-generation iPad mini is normal behavior for LCD screens."[41] Accordingly, there cannot be any serious doubt that Apple would have known of the Defect. Nonetheless, Apple did not amend it marketing materials to disclose the Defect, and instead, continued sales of the Device, affirmatively misrepresenting the iPad's display, as discussed above.

## CLASS ALLEGATIONS

80.     Plaintiff brings this lawsuit under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3) as representatives of:

> **Nationwide Class:**
> All persons within the United States who purchased, other than for resale, an iPad Mini (Sixth Generation).

> **Colorado Subclass:**
> All persons who purchased, other than for resale, within Colorado, an iPad Mini (Sixth Generation).

81.     The following persons and entities are excluded from the Class: Apple and its officers, directors, employees, subsidiaries, and affiliates; all judges assigned to this case and any

---

[40] Julia Clover, "iFixit Explains iPad Mini 'Jelly Scroll' Issue in Teardown Video," *MacRumors* (Sept. 29, 2021), https://tinyurl.com/2xvm7ytc (last accessed Jan. 25, 2022).
[41] Andrew Cunningham, "Newest iPad mini has a subtle scrolling problem," *ArsTechnica* (Sept. 27, 2021), https://arstechnica.com/gadgets/2021/09/2021-ipad-mini-suffers-from-uneven-jelly-scrolling-in-portrait-mode/ (last accessed Jan. 27, 2021).

members of their immediate families; and the parties' counsel in this litigation.  Plaintiff reserves the right to modify, change, or expand the Class definition, including proposing additional subclasses, based upon discovery and further investigation.

82.   **Numerosity.**   Apple sold tens of thousands of the Devices.   Members of the Classes are widely dispersed throughout the country.   Class members are so numerous that joinder is impracticable.

83.   **Typicality.**   Plaintiff's claims are typical of the claims of all Class members. Plaintiff, like all Class members, purchased the Device containing a defective display.  Plaintiff, like all Class members, would not have purchased, or would have paid substantially less for, the Device, had he known of the Defect or that Apple would respond inadequately when the Defect manifested.

84.   **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the Class.  He has no interests antagonistic to the interests of the other Class members and are committed to vigorously prosecuting this case.   Plaintiff has retained competent counsel experienced in the prosecution of consumer protection class actions involving defective consumer electronics.

85.   **Commonality and Predominance.**  Questions of law and fact common to the class members predominate over questions that may affect only individual Class members, because Apple acted on ground generally applicable to the Class as a whole.   Questions of law and fact common to the Class include:

  a.   Whether the Device was defective at the time of sale;

  b.   Whether the Defect substantially impairs the value of the Device;

  c.   Whether Apple knew of the Defect but continued to promote and sell the Device, including its defective display, without disclosing the Defect or its consequences to consumers;

  d.   Whether a reasonable consumer would consider the Defect and its consequences important to the decision of whether to purchase the Device;

e.      Whether Apple's representations and omissions concerning the Device and its embedded Defect were likely to deceive a reasonable consumer;

f.      Whether Plaintiff and Class members overpaid for their Devices as a result of the Defect;

g.      Whether Plaintiff and Class members are entitled to equitable relief, including restitution and injunctive relief; and

h.      Whether Plaintiff and Class members are entitled to damages or other monetary relief, and if so, in what amount.

86.    **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Apple's financial resources, Class members are not likely to pursue legal redress individually for the violations detailed in this Complaint.  Individualized litigation would significantly increase the delay and expense to all parties and to the Court and would create a potential for inconsistent and contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

87.    Class certification is also appropriate under Rules 23(b)(1) and/or 23(b)(2) because:

a.      The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standard of conduct for Apple;

b.      The prosecution of separate actions by individual Class members would create a risk of adjudication that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or would substantially impair or impede their ability to protect their interests; and

c.     Apple has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the members of the Class as a whole.

### FIRST CAUSE OF ACTION
**Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200,** *et seq*.

88.     Plaintiff, individually and on behalf of the Class, incorporates by this reference all allegations contained in the preceding paragraphs as if fully set forth herein.

89.     The UCL proscribes "any unlawful, unfair or fraudulent business act or practices and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

**Unlawful**

90.     Apple's conduct is unlawful, in violation of the UCL, because it violates the Consumers Legal Remedies Act, California's False Advertising Law, as well as the other statutes mentioned herein, and is otherwise, fraudulent in violation of the common law.

**Unfair**

91.     Apple's conduct is unfair in violation of the UCL because it violates California public policy requiring that goods which pass in California be accurately labeled.  To this point, Apple's fraudulent omission / concealment and its affirmative misrepresentations concerning the Defect is unfair to reasonable consumers.

92.     Moreover, Apple acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner.  Apple engaged in unfair business practices and acts in at least the following respects:

a.     Apple promoted and sold Devices it knew were defective because they contain a display prone to "screen tearing," resulting in nausea, headaches, blurred vision, and other similar symptoms;

b.     Apple promoted and sold Devices with a defective display despite knowing that users do not expect their display to manifest with "screen tearing," as described throughout;

c.    Apple failed to disclose that the Device is defective, and represented through advertising, its website, product packaging, press releases, and other sources that the Device possess particular qualities that were inconsistent with Apple's actual knowledge of the Device;

d.    Apple failed to exercise adequate quality control and due diligence over the Device before placing it in on the market; and

e.    Apple minimized the scope and severity of the problems with the Device, refusing to acknowledge that its display is defective in its marketing, advertising, and packaging, and, further, suggesting that the problems were normal against the weight of the evidence.

93.    The gravity of harm resulting from Apple's unfair conduct outweighs any potential utility. The practice of selling defective Devices without providing an adequate remedy to cure the Defect—and continuing to sell those Devices without full and fair disclosure of the Defect—harms that public at large and is part of a common and uniform course of wrongful conduct.

94.    The harm from Apple's conduct was not reasonably avoidable by consumers. The Devices suffer from a defect, and even after receiving a large volume of consumer complaints, Apple did not disclose the Defect. Plaintiff did not know if, and had no reasonable means of discovering, that the Display was defective.

95.    There were reasonably available alternatives that would have furthered Apple's business interests by satisfying and retaining its customers while maintaining profitability, such as: (1) acknowledging the Defect and providing a permanent fix; (2) adequately disclosing the Defect to prospective purchasers; and (3) offering suitable replacements.

**Fraud by Omission**

96.    Apple's conduct is fraudulent in violation of the UCL because it is likely to deceive reasonable consumers and:

a.    Apple knowingly and intentionally concealed the Defect from Plaintiff and Class members;

b.      Apple volunteered information to Plaintiff and Class members through advertising and other means that the Devices—and their displays—were functional, premium products without disclosing facts that would have materially qualified those partial representations; and

c.      Apple promoted the high quality and premium features of the Devices, including the display, despite knowing the Device is defective, and failed to correct its misleading partial disclosures.

97.     Apple had ample means and opportunities to alert Plaintiff and Class members of the defective nature of the Devices, including on the Device's webpages; in its advertisements of the Devices; on the Devices' external packaging; and as part of the standardized Device set up. Apple uniformly failed to disclose that the Device is defective.  Had Apple disclosed that the Device is defective, Plaintiff and Class members would not have purchased the Devices or would not have purchased them at the prices they did.

98.     Apple was under a duty to disclose the Defect because of its exclusive knowledge of the Defect before selling the Devices stemming from its quality control and pre-release testing, repairs data and internal reporting mechanisms, online complaints posted to forums Apple monitors, and those of major retailers; online reputation management, articles published by tech journals, as well as its own statements on the matter.  All of this would have put Apple on notice that the Devices were not as advertised and because it made partial representations about the Devices and its display without disclosing the display defect.

99.     Plaintiff and Class members suffered injury in fact, including lost money or property, as a result of Apple's unlawful, unfair, and fraudulent acts and omissions.  Absent Apple's unlawful, unfair, and fraudulent conduct, Plaintiff and Class members would not have purchased a Device or would not have purchased them at the prices they did.

100.    Through its unlawful, unfair, and fraudulent conduct, Apple acquired money directly and as passed on by Apple's authorized resellers (i.e. Amazon, Best Buy).

101.    Plaintiff and Class members seek appropriate relief, including (1) restitution under the UCL; and (2) such orders or judgments as may be necessary to enjoin Apple from continuing

its unfair, unlawful, and fraudulent practices. Plaintiff also respectfully seeks reasonable attorneys' fees and costs under applicable law, including under California Code of Civil Procedure 1021.5.

## SECOND CAUSE OF ACTION
### Violation of California's Consumers Legal Remedies Act,
### Cal. Civ. Code § 1750, *et seq*.

102. Plaintiff, individually and on behalf of the Class, incorporates by this reference all allegations contained in the preceding paragraphs as if fully set forth herein.

103. Apple is a "person" within the meaning of California Civil Code sections 1761(c) and 1770, and provided "goods" within the meaning of sections 1761(a) and 1770.

104. Apple's acts and practices, as alleged in this complaint, violate California Civil Code sections 1770(a)(5), (7), and (9) because they include unfair and deceptive acts and practices in connection with transactions involving the sale of the defective Devices. In violation of the CLRA, Apple:

a.  Represented that the Devices had characteristics, uses, and benefits they did not have;

b.  Represented that the Devices are of a standard, quality, or grade when in fact they are not; and

c.  Advertised the Devices with intent not to sell them as advertised.

105. Through its quality control and pre-release testing, repairs data and internal reporting mechanisms, online complaints posted to forums Apple monitors, and those of major retailers, online reputation management, articles published by tech journals, as well as its own statements on the matter, Apple knew of the Defect.

106. Apple was under a duty to disclose that the Device is defective because it had superior knowledge of the defect—stemming from the sources of knowledge pinpointed in the preceding paragraph—and because it made partial, materially misleading representations about the Device's high quality and premium features, including of the display.

107. Apple had ample means and opportunities to disclose to Plaintiff and Class members that the Device is defect, including through advertisements, external packaging, and

during the Device's initial setup process.  Despite its exclusive knowledge and opportunities to disclose the Defect, Apple failed to disclose the Defect to Plaintiff and Class members prior to purchase.

108.     Apple's misrepresentations and omissions were material.  Had Plaintiff and Class members known that the Device is defective, they would not have purchased the Devices or would not have purchased them at the prices they did.

109.     In accordance with California Civil Code section 1782(a), Plaintiff sent notice to Apple on December 2, 2021 via certified mail, return receipt requested to Apple's principal place of business, advising Apple of its violations and that it must correct, replace, or otherwise rectify the Devices alleged to be in violation.  Apple failed to correct its business practices or to provide the requested relief within 30 days.  Accordingly, Plaintiff sent further notice on February 8, 2022, advising Apple of its violations.  Plaintiff reserves the right to amend this Complaint to allege damages.

110.     Plaintiff was injured and continues to be injured by Apple's CLRA violations. Accordingly, Plaintiff seeks injunctive relief.

### THIRD CAUSE OF ACTION
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500,** *et seq.*

111.     Plaintiff, individually and on behalf of the Class, incorporates by this reference all allegations contained in the preceding paragraphs as if fully set forth herein.

112.     Apple's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public.  As described above, and throughout this Complaint, Apple misrepresented the Devices and concealed the Defect.

113.     By its actions, Apple disseminated uniform advertising regarding the Devices from California, across California, and outside California—but importantly, all decisions in this regard were made from California at Apple's headquarters.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et*

*seq.* Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

114.   The above-described false, misleading, and deceptive advertising Apple disseminated continues to have a likelihood to deceive in that Apple failed to disclose the Defect and how it negatively affects consumers' experiences with the Devices.

115.   Apple continued to misrepresent to consumers that its Devices were premium devices, capable of use for reading, writing, and other similarly productive tasks.  However, as described, this is not the case.

116.   In making and disseminating these statements from California, Apple new, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiff and other class members based their purchasing decisions on Apple's omitted material facts.  The revenue attributable to products sold in those false and misleading advertisements likely amounts to hundreds of millions of dollars.  Plaintiff and Class members were injured in fact and lost money and property as a result.

117.   The misrepresentations and non-disclosures by Apple of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

118.   As a result of Apple's wrongful conduct, Plaintiff and the class members lost money in an amount to be proven at trial.  Plaintiff and the class members are therefore entitled to restitution as appropriate for this cause of action.

119.   Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Apple's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

///

///

///

///

**FOURTH CAUSE OF ACTION**
**Violation of Colorado's Consumer Protection Act,**
**Colo. Rev. Stat. § 6-1-101, *et seq*.**

120.   Plaintiff, individually and on behalf of the Colorado Subclass, incorporates by this reference all allegations contained in the preceding paragraphs as if fully set forth herein.

121.   Apple is a "person" as defined by Colo. Rev. Stat. § 6-1-102(6).

122.   Apple engaged in "sales" as defined by Colo. Rev. Stat. § 6-1-102(10).

123.   Plaintiff Bryan and Colorado Subclass members, as well as the general public, are actual or potential consumers of the Devices as offered by Apple to consumers.

124.   Apple engaged in deceptive trade practices in the course of its business, in violation of Colo. Rev. Stat. § 6-1-105(1), including:

   a.   Knowingly making a false representation as to the characteristics of the Devices.

   b.   Representing that the Devices have characteristics, uses, benefits that they do not have.

   c.   Representing that the Devices are of a particular standard, quality, or grade, when they are of another.

   d.   Advertising the Devices with intent not to sell them as advertised.

   e.   Representing that a transaction confers or involves rights and remedies that it does not have or involved.

   f.   Representing that the subject of a transaction have been supplied in accordance with a previous representation when it has not.

125.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

126.   Apple intended to mislead Plaintiff and Colorado Subclass members and to induce them to reply on its misrepresentations and omissions.

127.   Had Apple disclosed to Plaintiff and Colorado Subclass members that it misrepresented the Devices, omitted material information regarding the Defect, and was otherwise

engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were capable of use as a Tablet and performed functions that the Device is not capable of performing or not capable of performing without substantial interference as discussed throughout.  Plaintiff and the Colorado Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which was not reasonably discoverable.

128.    Apple acted intentionally, knowingly, and maliciously to violate Colorado's Consumer Protection Act, and recklessly disregarded Plaintiff and Colorado Subclass members' rights.  Apple's knowledge of the Defect put it on notice that the Devices were not as it advertised.

129.    As a direct and proximate result of Apple's deceptive trade practices, Colorado Subclass members suffered injuries to their legally protected interests.

130.    Apple's deceptive trade practices significantly impact the public because Apple is the second-largest manufacturer of like-devices in the world, with thousands of sales of like-devices to Colorado consumers.

131.    Plaintiff Bryan and Colorado Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of: (a) actual damages, or (b) $500, or (c) three times actual damages (for Apple's bad faith conduct); injunctive relief; and reasonable attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
**Fraud**

132.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

133.    Plaintiff brings this claim on behalf of the Class under California law, or alternatively, under the laws of the state of Colorado.

134.    At the time Plaintiff and Class members purchased their Device, Apple did not disclose, but instead concealed and misrepresented, the Defect as discussed herein.

135.    Apple affirmatively misrepresented the Devices display, giving the Device the appearance of a high-quality tablet that is free from defects.

136.    Apple also knew that its omissions and misrepresentations regarding the Device were material, and that a reasonable consumer would rely upon Apple's representations (and corresponding omissions) in making purchasing decisions.

137.    Plaintiff and Class members did not know—nor could they have known through reasonable diligence—about the Defect.

138.    Plaintiff and Class members would have been reasonable in relying on Apple's misrepresentations (and corresponding omissions) in making their purchasing decisions.

139.    Plaintiff and Class members had a right to reply upon Apple's representations (and corresponding omissions) as Apple maintained monopolistic control over knowledge of the true quality of the Device and of the Defect.

140.    Plaintiff and Class members sustained damages as a result of their reliance on Apple's omissions and misrepresentations, thus causing Plaintiff and Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## SIXTH CAUSE OF ACTION
### Fraudulent Omission / Concealment

141.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

142.    Plaintiff brings this claim individually and on behalf of the proposed Class under California law or, alternatively, the law of the state of Colorado.

143.    Apple intentionally suppressed and concealed material facts about the performance and quality of the Device.  As alleged herein, Apple knew that the Device's display is defective.  Further, Apple was aware of numerous consumer complaints concerning the defect-related problems, but never disclosed the Defect to Plaintiff and Class members.

144.    Plaintiff and Class members had no reasonable means of knowing that Apple's representations concerning the Devices were incomplete, false, or misleading, or that it had failed to disclose that the Device is defective.  Plaintiff and Class members did not and reasonably could not have discovered Apple's deceit before they purchased the Device.

145.    Had Plaintiff and Class members known that the Devices are defective, they would not have purchased the Devices or would not have purchased it at the price they did.

146.    Apple had a duty to disclose the Defect because the Defect is material and Apple possessed exclusive knowledge of it, as discussed above.  For example, Apple conducted pre-release testing of the Devices and its internal components.  This testing would have revealed the existence of the Defect before the Device's release.  Only Apple had access to those results.

147.    Apple also had a duty to disclose the Defect because, through advertising, press releases, and statements made during the launch event, on its Device page, in its online purchase portal, and in other sources that Plaintiff and Class members encountered before purchasing their Devices, Apple made partial representations regarding the supposed high quality of the Device and its premium features—including the display—but failed to disclose facts that would have materially qualified these partial representations.  Having volunteered information related to the display to Plaintiff and Class members, Apple had a duty to disclose the whole truth about the screen and, in particular, its defective nature.

148.    Plaintiff was exposed to Apple's specific representations about the Device before and immediately after purchase.  Plaintiff saw Apple's representations about the Device online, in product advertisements, and received further information from Apple about the Device during its setup process.  Plaintiff also saw the external packaging of the Devices—which Apple had developed—before purchasing or using the Device.  None of the informational sources Plaintiff encountered—advertisements, websites, external packaging, the set up process, or the Device's launch event—indicated that the Device is defective.

149.    Apple concealed the Defect to sell more Devices at a premium price, prevent damage to its brand, and avoid the costs of developing a fix for the Defect and or repairs or replacements.

150.    The facts about the Device's display that Apple suppressed and omitted were material, and Plaintiff and Class members were unaware of them until they experienced the Defect.  Had Apple disclosed the Defect, including through advertising, press releases, the Device's

packaging, or in the initial set up process, Plaintiff and Class members would not have purchased the Device or would have paid substantially less for it.

151.    When deciding to purchase the Devices, Plaintiff and Class members reasonably relied to their detriment upon Apple's material misrepresentations and omissions regarding the quality of the Devices and the absence of a Defect.

152.    Plaintiff and Class members sustained damages as a direct and proximate result of Apple's deceit and fraudulent concealment.  Among other damages, Plaintiff and Class members did not receive the value of the premium price they paid for the Device.

153.    Apple's fraudulent concealment was malicious, oppressive, deliberate, and in reckless disregard of Plaintiff's and Class members' rights, interests, and well-being.  Apple's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct, to be determined according to proof.

### SEVENTH CAUSE OF ACTION
#### Fraudulent Misrepresentation

154.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if full set forth herein.

155.    Plaintiff brings this claim individually and on behalf of the proposed Class under California law or, alternatively, the law of the state of the state of Colorado.

156.    At all relevant times, Apple was engaged in the business of designing, manufacturing, distributing and selling the Device.

157.    Apple, acting through its representatives or agents, delivered the Devices to its own distributors and various other distribution channels.

158.    Apple willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Devices, including of the Defect.

159.    Rather than inform consumers of the truth regarding the Defect, Apple misrepresented the quality of the Devices, including the display at the time of purchase.

160.    Apple made these material misrepresentations to boost or maintain sales of the Devices, and to falsely assure purchases of the Devices that Apple is a reputable company and that

its Devices are reliable and able to perform as promised.  The false representations were material to consumers because the representations played a significant role in the value of the Devices purchased.

161.    Plaintiff and Class members accepted the terms of using, which were silent on the Defect.    Plaintiff and Class members had no reasonable way of knowing that Apple's misrepresentations as to the Devices and of the display, and had no reasonable way of knowing that Apple's misrepresentations were misleading.

162.    Although Apple had a duty to ensure the accuracy of the information regarding the Devices and the display, it did not fulfill these duties.

163.    Apple misrepresented material facts partly to pad and to protect its profits, as it saw that profits and sales of the Devices were essential for their continued growth and to maintain and grow their reputation as a premier designed and vendor of the Devices.  Such benefits came at the expense of Plaintiff and Class members.

164.    Plaintiff and Class members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and Class members' actions were justified given Apple's misrepresentations.  Apple was in the exclusive control of material facts, and such facts were not known to the public.

165.    Due to Apple's misrepresentations, Plaintiff and Class members sustained injury due to the purchase of Devices that did not live up to their advertised representations, especially those concerning the display.  Plaintiff and Class members are entitled to recovery full or partial refunds for the Devices they purchased due to Apple's misrepresentations, or they are entitled to recover full or partial refunds for the Devices they purchased due to Apple's misrepresentations, or they are entitled to damages for the diminished value of their Devices, amounts to be determined at trial.

166.    Apple's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's, and Class members' rights and well-being, and in part to enrich itself at the expense of consumers.  Apple's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor

devices.  Apple's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### EIGHTH CAUSE OF ACTION
#### Negligent Misrepresentation

167.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

168.    Plaintiff brings this claim individually and on behalf of the proposed Class under California law or, alternatively, the law of the state of Colorado.

169.    Apple negligently and recklessly omitted certain material facts regarding the Devices and of their display.  Apple failed to warn consumer that their Devices contained a material Defect that resulted in the display not performing as warranted or advertised.

170.    The advertisements and warranties, which were made through uniform representations from Apple were material and would have been considered by a reasonable consumer, including Plaintiff, in making purchasing decisions.

171.    Plaintiff and Class members acquired the Devices believing they would function as advertised.

172.    As a result, Plaintiff and Class members were directly and proximately injured by Apple's negligence and in failing to inform Plaintiff and Class members of the material defect in the Device as it relates to the display.  Accordingly, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

### NINTH CAUSE OF ACTION
#### Quasi-Contract / Unjust Enrichment

173.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

174.    Plaintiff brings this claim in the alternative to their claims at law, individually and on behalf of the proposed Class under California law or, alternatively, the laws of the state of Colorado.

175.    Plaintiff and Class members purchased the Devices from Apple, and those Devices were not as Apple represented them to be, enticing Plaintiff and Class members to purchase the Devices.  Had Plaintiff and Class members known of the Defect, they would have paid less for their Devices and would not have purchased them.

176.    Accordingly, Plaintiff and Class members were damaged, and Apple was unjustly enriched by the purchased price of those Devices.

177.    Plaintiff and Class members are therefore entitled to damages in amount Apple was unjustly enriched, to be determined at trial.

178.    Moreover, Apple's conduct was willful, intentionally deceptive, and tended to cause economic injury to Plaintiff and the Class.  Apple is therefore liable to pay punitive damages.

179.    In every contract or agreement there is an implied promise of good faith and fair dealing under California law and of the laws of the states where non-California Plaintiff purchased their Devices.  Apple breached this implied promise.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the nationwide Class and the Colorado Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Subclass, and Plaintiff's attorneys as Class Counsel to represent the proposed Class and Subclass;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff, the Class, and the Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper;

1

2

(h)     For an order awarding Plaintiff and members of the Class and Subclass their reasonable attorneys' fees and reimbursement of litigation expenses and costs of suit; and

3

4

(i)     For such other and further relief as the Court may deem proper.

5     Dated: February 9, 2022                              Respectfully submitted,

6                                                          **BURSOR & FISHER, P.A.**

7                                                          By:     _/s/ L. Timothy Fisher_
8                                                                       L. Timothy Fisher

9                                                          L. Timothy Fisher (State Bar No. 191626)
                                                           Sean L. Litteral (State Bar No. 331985)
10                                                         1990 North California Boulevard, Suite 940
                                                           Walnut Creek, CA  94596
11                                                         Telephone: (925) 300-4455
                                                           Facsimile:  (925) 407-2700
12                                                         Email: ltfisher@bursor.com
13                                                                       slitteral@bursor.com

14                                                         **BURSOR & FISHER, P.A.**
                                                           Joseph I. Marchese (*pro hac vice forthcoming*)
15                                                         888 Seventh Avenue
                                                           New York, NY 10019
16                                                         Telephone: (646) 837-7150
                                                           Facsimile: (212) 989-9163
17                                                         Email: jmarchese@bursor.com

18

19                                                         *Attorneys for Plaintiff and the Putative Class*

20

21

22

23

24

25

26

27

28

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Christopher Bryan.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California.  Namely, the practices described herein were conceived, reviewed, approved, and otherwise controlled from Apple's nerve center, its headquarters in Cupertino, California.  Employees at Apple's headquarters directed the production and assembly of the iPad Mini's hardware and software, including the defective LCD displays.  Promotional activities and literature were developed and coordinated at, and emanated from, Apple's California headquarters.  For these reasons, and those listed next, the application of California law is appropriate for non-California residents.  For example, the launch event for the iPad Mini occurred in Cupertino.  Apple made critical decisions about the development, marketing, and advertising of the iPad Mini in California.  Misrepresentations and omissions alleged herein were made by Apple employees based in California and were contained, among other places, on Apple's website, which is maintained by Apple employees based in California.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 9th day of February 2022.

_____*/s/ L. Timothy Fisher*_____
L. Timothy Fisher